REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2722

September Term, 2013

_____

RAHYMEEN J. BARBER

v.

STATE OF MARYLAND

_____

Eyler, Deborah S.,
Reed,
Salmon, James P.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Salmon, J.

_____

Filed: February 2, 2017

In 2010, Rahymeen Barber, appellant, was found guilty by a jury in the Circuit Court for Wicomico County of sexual abuse of a minor, second-degree rape, second-degree sexual offense, three counts of third-degree sexual offense, and three counts of second-degree assault. The court sentenced appellant to a term of 50 years imprisonment. Upon direct appeal of his convictions, a panel of this Court affirmed the judgment of the trial court in an unreported opinion. *See Rahymeen J. Barber v. State of Maryland*, No. 2238, Sept. Term, 2010 (filed June 13, 2012)**.**

Appellant thereafter filed a petition for post-conviction relief alleging, *inter alia*, that his trial counsel seriously prejudiced him by failing to investigate the validity of the opinions of the State's expert witness and failing to present expert testimony to counter the State's expert witness who opined that the victim's "normal" genital examination was not inconsistent with the victim having been raped. After the circuit court denied his petition,[1] appellant sought leave to appeal, which we granted.

For the reasons that follow, we affirm the judgment of the post-conviction court.

---

[1] The circuit court granted appellant partial post-conviction relief by allowing him to belatedly file both a motion for modification or reduction of sentence pursuant to Md. Rule 4-345(e), and an application for review of sentence by a three-judge panel pursuant to Md. Rule 4-344.

# I.

## BACKGROUND

Set forth below is an excerpt from an unreported opinion by the panel of this Court that considered appellant's direct appeal. This excerpt provides a useful recap of some of the important evidence introduced at appellant's jury trial:[2]

> This case concerns the sexual abuse of a minor, G.S. [born June 3, 1998], that occurred between 2003 and 2009, when G.S. ranged in age from five to nine years old. At the time of trial, G.S. was twelve-years-old and lived on Jackson Street in Salisbury, Maryland. She testified that she knew appellant, her former stepfather, as "Poppy."

> Appellant lived with G.S. for several years in different locations in the Salisbury area. The parties stipulated as follows: from June 10, 2003, until July 10, 2004, the family lived on Light Street; from July 11, 2004, to January 31, 2007, the family lived on Mitchell Street; and, from February 1, 2007, to April 30, 2009, the family lived on Tilghman Street.

> G.S. . . . testified to details of various sexual assaults inflicted upon her by appellant. On one occasion at the Light Street address, when G.S. was five-years-old, appellant called her into the living room and had her remove her pants and underwear. Appellant, who was lying on the couch and attired only in a shirt and boxer shorts, placed G.S. on top of him and started moving her around. G.S. testified that she felt appellant's private part on her vaginal area and testified that "[w]hen he was putting it in me, it would hurt. It was hurting."

> ***

> G.S. . . . recounted another incident, this time when appellant was living with the family on Mitchell Street. She testified that appellant asked her to lie down with him in bed, and then "he took my underwears [sic] off and everything and put his private part in my private part and did the same thing over again." She clarified that appellant's private part was his penis and her private part was her vagina. G.S. also testified that she felt something

---

[2] In the panel's opinion the victim is referred to by her first name. In the excerpt we have substituted the initials "G.S." for the name of the victim.

wet and noticed that it was white. G.S.'s mother worked late at night and was not at home at the time.

After the family moved to Tilghman Street, another incident occurred when appellant picked G.S. up while they were in the kitchen and "was scooting me down by his private." Both were wearing clothes at the time, but G.S. testified that she "felt his private, like kind of like scoot – like sticking up."

\*\*\*

Dr. Jennifer Wehberg, accepted as an expert in pediatric medicine with an emphasis on child sexual abuse, examined G.S. on July 2, 2009. At that examination, G.S. only described the initial incident that occurred on Light Street. G.S. had a normal physical exam, including her vaginal and rectal exam. Because the vaginal area may heal rapidly, Dr. Wehberg testified that "a normal physical exam can be consistent with her disclosure."

\*\*\*

Heather Sullivan, a social worker assigned to the Wicomico County Child Advocacy Center, testified that she first interviewed G.S. on May 19, 2009. G.S. described only the first incident of alleged sexual abuse that occurred when the family lived on Light Street. G.S. was re-interviewed on July 10 2009, and gave more details about this same, singular incident.

Sullivan then testified that she interviewed G.S. a third time on January 28, 2010. At this time, G.S. informed Sullivan that there had been more than just the one incident on Light Street. G.S. described the incident on Mitchell Street when appellant had G.S. lie on top of him. G.S. also indicated that this incident included appellant instructing her to perform oral sex on him. G.S. also described another incident at the Mitchell Street address, and this one involved penetration and ejaculation.

G.S. further informed Sullivan about a fourth incident at the Tilghman Street address when appellant had her lie on top of him on the couch and "again moved her up and down, privates touching privates, genitals touching genitals." A fifth incident also occurred at Tilghman Street, when appellant pulled G.S. towards him and their genitals touched through their clothing.

Tahesha Barber, G.S.'s mother, was married to appellant from 2004 to August 2010. G.S. first informed her mother about one incident of sexual

abuse in May 2009, and Barber reported it to the Child Advocacy Center. Agreeing that G.S. disclosed information to her on two occasions, Barber testified that she was confused and "I didn't want to believe it the first time she told me, you know." After this initial interview with the Child Advocacy Center, Barber and her other children still had contact with appellant. G.S. would be present on some occasions when appellant visited Barber and the other children. Barber also testified that G.S. was interviewed again at the Child Advocacy Center in January 2010, after making a second disclosure.

\*\*\*

Appellant testified on his own behalf and denied that any of the incidents occurred. Appellant denied having intercourse, oral sex or any sexual relations with G.S. On cross-examination, appellant agreed he was the father-figure in the household, that he disciplined the children, and that the children loved him.

*Rahymeen J. Barber v. State of Maryland*, No. 2238, Sept. Term, 2010, slip op. at 1-12.

Concerning what G.S. said in regard to the force used when the second-degree rape occurred, the following exchange between appellant's trial counsel and G.S. is relevant:

Q: So when you say, my private part, you mean your vagina, is that right?

A: Yes.

\*\*\*

Q: You indicated in response when telling that story that Mr. Barber put his penis in your vagina on that occasion, right?

A: Yes.

Q: You didn't tell that to Miss Heather [Sullivan] did you?

A: I told her that he put his private in my private.

\*\*\*

Q: On both of those occasions, did you tell Miss Heather that Rahymeen put his penis in your vagina?

4

A: Yes.

***

Q: You didn't tell her anything that happened. On the two occurrences on Mitchell Street, you indicated that Mr. Barber put his penis in your privates, correct?

A: Yes.

In recounting G.S.'s disclosures, to her, Dr. Wehberg testified that G.S. "stated that her stepdad put his thing into her," she also responded to the question "G.S. disclosed penetration to you, is that right?"

A: Yes, she did.

Similarly, Heather Sullivan testified:

A: She [G.S.] again reported that it occurred in Mr. Barber's bedroom. Again, the bottom part of her clothing were removed. He again laid her on top of him, and his penis was hard. At this point in time, she described that his penis did go inside of her....

She described his penis again as hard as it went inside of her, and that it was nasty.

***

Q: Did she indicate the force with which the defendant moved?

A. I mean, she described it going inside of her and using that force to make that occur, and that it was not comfortable.

## II.

### Additional Trial Testimony of Jennifer Wehberg, M.D.

Jennifer Wehberg, M.D., a board certified pediatrician and a CHAMP (Child Abuse

5

Medical Provider) physician, was called as an expert witness for the State during appellant's 2010 jury trial. She examined G.S. more than two years after the last incident of alleged rape. Dr. Wehberg testified that she conducted a physical examination of G.S.'s vagina and rectum and that the results were "normal." She explained that a "normal finding means that she [G.S.] did not have any lacerations, cuts, redness, discharge, scarring, that there was no evidence of acute trauma, which means immediate trauma to the vaginal rectal area, and there was no evidence of scarring."

Dr. Wehberg then opined that the "normal" finding was not inconsistent with G.S.'s disclosure that appellant had penetrated her vagina with his penis. She explained that "[t]he vaginal area is very vascular and very elastic and can heal very rapidly. Often within a few days, if you have genital trauma, it can be healed to the point where you can't recognize it as trauma."

On cross-examination of Dr. Wehberg by appellant's trial counsel, the following exchange occurred:

Q: You examined as part of her genital examination, the presence or absence of a hymen, correct?

A: Yes.

Q: And you describe her hymen as crescentic?

A: Crescentic.

Q: Crescentic. Can you tell me what that means?

A: A hymen is a thin membrane of tissue that covers the vaginal opening. When you're very young, your hymen is what we call, annular. It's circular in shape covering the vaginal opening. As you get more into

6

young childhood, it becomes a crescent which is a half-moon shape. It goes over the hymen, and you can see a crescent of a thin membrane.

Q:    Okay.

A:    That hymen as you enter puberty again turns into an an[]ular hymen which is round.

Q:    The genital exam was perfectly normal, correct?

A:    Yes, it was.

Q:    There was, according to the report, no scarring, no damage, is that a fair statement?

A:    Yes, it is.

Q:    Your opinion or your diagnostic impression is that it is a normal physical exam, cannot diagnose or exclude abuse?

A:    Right.

Q:    Is that another way of saying, I don't know, maybe, maybe not?

A:    That's a way of saying, I can't tell by her physical exam whether there has been sexual abuse.

Q:    Can't confirm?

A:    Right.

Q:    Can't –

A:    Can't confirm it, can't –

Q:    Exclude it?

A:    – deny it, yes.

On re-direct examination of Dr. Wehberg the following colloquy occurred:

Q:    Are you . . . familiar with the research regarding medical findings in

the victims of substantiated child sexual abuse?

Q: Yes, I am.


A: Yes, I am.

Q: What does the research say regarding a normal genital exam?

A: A normal genital exam can be consistent with penetrating sexual abuse.

Q: Is there a percentage of cases in which there are – sex abuse has been confirmed but it remains a normal genital exam?

A: It has been shown that you can have a normal vaginal exam with penetrating sexual abuse. I do not know the percentage off my head without the cited article in front of me.

## III.

## POST CONVICTION PROCEEDINGS

The only crime of which appellant was convicted that required proof of penetration was second-degree rape. The flagship allegation made in appellant's petition for post-conviction relief dealt with two criticisms: (1) that defense never consulted with an OBGYN or child sexual abuse specialist; and (2) no defense expert was called to refute the opinion of Dr. Wehberg that a normal genital exam can be consistent with penetrating sexual abuse.

In *Kackley v. State*, 63 Md. App. 532 (1985) we said:

Penetration is a necessary element of the crime of second degree rape, Md. Ann. Code art. 27, § 463(a)(3); *Smith v. State*, 224 Md. 509, 168 A.2d 356 (1961); *Craig v. State*, 214 Md. 546, 136 A.2d 243 (1957); and "penetration, however slight, will sustain a conviction . . . but the proof thereof must sustain a *res in re*; that is, an actual entrance of the sexual organ of the male within the *labia* (*majora*) of the *pudendum* (the external folds of the *vulva*) of the female organ, and nothing less will suffice." *Craig v. State, supra,* citing 1 Wharton, *Criminal Law* (12th ed.), § 697.

8

A brief description of the female genital area, referred to in *Craig,* is in order.

> The *mons pubis* is the fat filled cushion over the anterior surface of the hair triangle. The *labia majora* consists of two rounded folds of adipose tissue extending downward and backward from the *mons pubis*. Within the *labia majora* are two flat, reddish folds of tissue that encase the clitoris; this tissue is clinically known as the *labia minora*.
>
> The *pudenda*, or the external organs of generation, commonly designated as the *vulva*, includes all structures visible externally from the *pubis* to the *perineum* (the area bounded by the *mons* in front, the buttocks behind and the thighs laterally). *Williams Obstetrics*, 16th Ed., Pritchard-McDonald (1980).

> Thus, penetration into either the *labia minora* or the vagina is not required; invasion of the *labia majora*, however slight, is sufficient to establish penetration.

*Id.* at 536-37.

The relevant genital features of a girl, before puberty, are shown on Exhibit A (attached). To prove penetration, it is not necessary to prove that the hymen was ruptured. *Craig*, 214 Md. at 549.

**Testimony of Dr. Theodore Hariton**

During the post-conviction petition hearing, appellant called Dr. Theodore Hariton, a board-certified OBGYN from Tucson, Arizona.[3] He testified that he had reviewed Dr. Wehberg's trial testimony, Heather Sullivan's deposition and trial testimony and G.S.'s

---

[3] Dr. Hariton is an experienced expert witness, having previously testified for the defense throughout the United States concerning allegations of child abuse. Prior to giving his testimony to the post-conviction court, he had testified in 55 cases.

trial testimony.  On direct-examination he testified, in pertinent part, as follows:

Q:    And after you reviewed it did you arrive at any conclusions regarding whether the medical evidence was consistent with penetration?

A:    I did.

Q:    And what were those conclusions?

A:    With reasonable medical certainty there's no medical evidence that penal [sic] vaginal penetration occurred at that time.

Q:    Okay.  So would it be unusual for a six-year-old[4] or a very young girl to have no finding after an episode of nonconsensual penal [sic] vaginal penetration?

A:    Yes, it would.

Q:    And what would you expect the history and physical findings to be that would be consistent with vaginal penetration?

A:    Well, two things.  First of all, the history, you should have pain and bleeding.  If you go inside a hymen and tear a hymen in a little girl it will bleed and cause pain.  The second thing is it will heal, all of them heal very nicely but it will heal with some physical change in shape that will tell you that something happened in this period of time.

Q:    And are both these findings important?

A:    Yes.

Q:    And why so?

A:    Well, the history of bleeding, pain and bleeding is one of the most consistent things in all the literature.

Q:    Okay.

A:    When you go through the findings you have the history of pain and

---

4 G.S. was eleven years old when she was examined by Dr. Wehberg on July 9, 2009.

bleeding.

Q:    And were these present in this case?

A:    No, there was no evidence – I'm sorry, there was nothing in this record that I found.[5]

Q:    What would be the diameter of a vaginal opening in a girl this age?

A:    Hymenal opening in a girl in this age would be six or seven millimeters, like half the size of your little finger.

Q:    And what's the average diameter of an erect male penis?

A:    35 to 39 millimeters.

Q:    It's about an inch and a half?

A:    About an inch and a half, yeah.

Q:    Okay.  So it's maybe an inch and a half trying to get into a quarter inch roughly?

A:    Roughly.

Q:    Now is the hymen stretchable or would it tear if it were penetrated?

A:    It is not stretchable.  When you examine a little girl, frequently you'll have to examine and get a specimen with a Q-tip.  And if you touch the hymen with your Q-tip the kid jumps.  It's very delicate and very thin.

***

Q:    Okay.  Now what would a normal six-year-old vaginal area look like?

A:    Well, the labia majora would be flat, the labia minora is very, very thin.  The whole area is pinkish.  It's a little redder than an adult because the tissue, the vessels are so close to the skin.  It's very thin,

_____

[5] There was a history from G.S. of pain but she never reported bleeding.

11

two to three cells thick, it's not stretchable, it's very easy, it's not distensible because there's no rigi, it won't stretch. It's really vulnerable to any trauma or to infection.

***

Q: <u>So what kind of medical evidence could be found after forceful penal [sic] vaginal penetration of a girl around six years old</u>?

A: What you should see is depending if it's a complete laceration or not–

Q: Could you speak a little bit slower?

A: Okay, I'm sorry. It depends on the depth of the penetration, how far it went. It doesn't fit so therefore it can't go very far. But it can tear. If it's a transection, which means it goes all the way through the hymen down to the vagina, then you'll see that the hymen is a circle like this, and would be a totally complete circle. If you tear, do a transection, it means you cut all the way through here, this would be the vagina, and when they heal it will still heal like this but it will heal with a section, there won't be any hymen here at all.

And if it's not totally sometimes you just have a very deep notch right in that area that's easy to see. It will all heal so it will be smooth, but it will be a change.

Q: So there would be some kind of –

A: Physical evidence, yes.

Q: There would be some kind of result, some kind of evidence left –

A: Yes.

Q: – if this happened, okay.

Is there anything in the reports that you read that suggests that there was actual penal [sic] vaginal penetration?

A: No.

Q: And you stated that you reviewed the testimony by Dr. Wehberg?

12

A:    I did.

Q:    Did you find any problems with her testimony?

A:    I did.

Q:    What were they?

A:    <u>First and most important was she said that the hymen of a little girl is very vascular and elastic</u>.  It is not elastic, it's not stretchable at all, and it's not vascular.  It looks a little pinker than the rest of the tissue because it's so thin blood, the vessels that are there are closer to the surface.  But it's not stretchable.

Q:    So she was wrong in that statement?

A:    She was incorrect in that statement.

Q:    Now are there other parts of her testimony that concerned you?

A:    Yes.

Q:    What were they?

A:    <u>She also said that there's medical literature saying that she's right, that you can have penal [sic] vaginal penetration in a prepubertal girl without any physical findings</u>.

Q:    And is that incorrect?

A:    That is incorrect.

(Emphasis added.)

On cross-examination, Dr. Hariton testified:

Q:    If there's injury to the hymen will there always be scarring?

A:    Again what age?

Q:    Prepubertal.  You can assume that that's what we're talking about

13

today, Dr. Hariton.

A:   There should be scarring, yes.  Now, the amount of scarring will be different.

Q:   Depending on?

A:   The health of the girl, the age of the girl, if she has any estrogen, and the amount of damage, the depth of the damage.

Q:   So depth?

A:   Yes.

Q:   So if there is a superficial injury to the hymen will a physician be able to see scarring?

A:   It may or may not form a notch, a superficial notch.  But a penis can't get in a little -- a 39 millimeter penis can't get into a six millimeter hymen with a superficial injury.

Q:   And I will go ahead and inform you penetration is defined in the State of Maryland as entrance into the labia minor.

A:   Okay.

Q:   So while I appreciate your definition that it's, you know, penile penetration into the vagina, that is not what's legally required in the State of Maryland.

A:   That's true, but to a juror I think penetration means penetration.  The word penetration means to enter.  It means to enter.

Q:   It means however slight in the State of Maryland, Dr. Hariton.

A:   Okay.

Q:   So it does not require piercing, puncture or any injury to the hymen, just so that you're clear.

A:   Okay.

14

Q:     If there's injury to the hymen will there be bleeding?

A:     I'm sorry?

Q:     If there's injury to the hymen will there be bleeding?

A:     There should be, yes, depending on the amount of injury, obviously.

Q:     If there is forceful penile penetration into the hymen will there be bleeding?

A:     Should be.

Q:     The primary way that physicians diagnose sexual abuse?

A:     By the history and by the examination.

Q:     By patient history[?]

A:     Patient history and examination.

Q:     The timing of the examination, is that crucial to determining whether there was penetration?

A:     If you examine a child at the acute phase of contact you'll see a different set of findings, just penile contact or touching you'll have bruising, a little staining, a little bit of this, and it heals very quickly. But actual penetration by this time it's healed. There's a short period of time it takes to heal the small stuff.

Q:     So things heal very quickly in the hymen or in the vaginal area correct?

A:     Reasonably quickly. Again depending on the child and the injury.

***

Q:     . . . Did you view the photographs Dr. Wehberg took in this case?

A:     No, I never got the photographs.

Q:     She testified that there was no evidence of acute trauma and no

15

evidence of scarring.

A:     Yes, I saw that.

Q:     And you're aware that she [Dr. Wehberg] testified on cross-examination that she could not confirm or deny that abuse had happened in this case?

A:     That is correct.

Q:     Is that accurate, would that be an accurate statement?

A:     Without any findings you can't confirm or deny? … I said without any findings you can neither confirm nor deny that there was sexual activity.  In this case you can deny penile vaginal penetration but you couldn't deny sexual contact.

Q:     And penile vaginal you mean penis through the hymen?

A:     No.

Q:     You don't mean penis through the labia majora or labia minora?

A:     I do not.

***

Q:     Dr. Hariton, when you testified on direct that to a reasonable degree of medical certainty there was no evidence of penetration based on what you reviewed in this case, you meant penetration to the hymen?

A:     I meant physical penetration of the penis into the vagina.

Q:     Into the vagina, and to get to the vagina the penis would have to --

A:     Go through the hymen.

Q:     Go through the hymen.  Okay.  Just so we're clear.

***

Q:     . . . If you would, the textbook that you so kindly brought, Evidence

16

of – Evaluation of the Sexually Abused Child, would you turn to page 120, please?

\*\*\*

And captioned under sexual abuse delayed disclosure.

\*\*\*

That paragraph discusses findings in chronic, in cases of chronic sexual abuse, is that correct?

A:    The first edition, this chapter was called sexual abuse chronic changes.  This edition she's changed that to sexual abuse delayed disclosure.  So the two books, the chronic changes, that's why she says what we term chronic changes in the previous edition.

Q:    If you will read for the Court that paragraph.

A:    What we termed chronic conditions in the previous edition was better described as medical findings associated with healed genital trauma.  Since most children delay disclosure, medical professionals are typically asked to evaluate a child long after injuries should have healed.  However, as noted previously, where there has been significant trauma associated with vaginal penetration, healed disruptions of the posterior fourchette, vestibular mucosa, hymen and anus may be found.

Q:    May be found.

A:    Yes.

Q:    So a normal genital exam can be consistent with penetrating vaginal abuse, is that correct?

A:    I've never seen that written.  It would depend on how much penetration we're talking about.  We're talking about the child.  The amount of penetration, how the child heals.

Q:    Is it is possible, is my question?

A:    I don't know, I've never seen it, never seen it written.

17

Q:      Based on your experience and your review of the literature, it can be consistent?

A:      It's a very hard question because I've never seen it, never seen it happen, and the tendency in medicine is to always say never say never.

***

We always say never say never. We learned over the years to do that. How does it relate to this case? I have no idea. I'm not saying because I don't know.

(Emphasis added.)

During the hearing on the post-conviction petition, appellant's former trial counsel testified, on direct-examination by appellant's post-conviction counsel, that he did not consult a defense medical expert. He explained:

Q:      All right. Now, you saw a note [in Dr. Wehberg's report] that the hymen was normal on this.

A:      Yes.

Q:      That's on the last page. And then if I can point that to you. And it said at the top of this page, this does not rule out possible abuse.

A:      Yes.

Q:      Do you see that?

A:      Yes.

Q:      And do you see where it says under diagnostic impression, normal physical exam, cannot diagnose or exclude abuse?

A:      Yes.

Q:      So the child, in your opinion, or what you read could have been abused or not?

A:      Correct. I was satisfied with the results.

                            ***

Q:      Was your theory then that the State could not prove beyond a reasonable doubt that she was abused?

                            ***

A:      Yes.

Q:      Did you review the literature concerning sexual abuse of young girls?

A:      Prior to Mr. Barber's case?

Q:      Correct.

A:      I don't recall prior to Mr. Barber's case. I have reviewed literature in the past.

Q:      Did you do any research about diagnosis of whether – what types of medical exams could be consistent or not consistent with abuse?

                            ***

A:      Yeah. Have I researched? I've had other cases where experts have testified and I have read.

Q:      Okay. Did you consider in this case consulting with a child sexual abuse specialist expert?

A:      No, I didn't.

Q:      Now the State disclosed their experts to you, do you recall that?

                            ***

A:      I remember Dr. Wehberg.

                            ***

Q:      Okay. So you knew what Dr. Wehberg's opinion was going to be

19

from her report, you knew that in advance, is that right?

A:      Correct.

***

Q:      Okay.  Now you have been a trial attorney for is it 20 years, right?

A:      17, I think close to 20.

Q:      And you've seen juries go either way, correct?

A:      I have.

***

I had a hard time winning these types of cases in front of juries.

Q:      And yet your theory was to rely solely on the maybe she was abused and maybe she wasn't, there wasn't reasonable doubt to prove she was abused?

A:      With, with all respect you just said two things.  Maybe she was and maybe she wasn't.  I did argue reasonable doubt.  I didn't see any evidence that she was, so that was part and parcel of my argument, yes.

On cross-examination by the State, appellant's trial counsel testified that as a public defender he had represented "thousands" of criminal defendants and that, because he handled all of the child sex abuse cases for the public defender's office in Wicomico County for a period of three to four years, he had handled a "significant" number of such cases.  He then testified as follows:

Q:      Why didn't you consider consulting with an expert in Mr. Barber's case?

A:      Personally I didn't think I needed to.

Q:	Why?

A:	There were all the elements in place in this case, in my opinion, we should have won. And Dr. Wehberg's opinion I was generally satisfied with.

\*\*\*

Q:	You said you had a hard time winning these in front of juries. In your experience what's the deciding factor for a jury in a case where there's no physical evidence?

A:	I would say I don't think there's one – personally I don't believe that there's one deciding factor. I think if what is in place is a reason for the victim to fabricate or make it up, there's a lack of physical evidence, there's an articulate criminal [d]efendant who can testify, all of those factors are significant. And if you have, as I did in this case, I had all of those factors, I think they all play together.

Q:	And the defendant testified in this case?

A:	If I recall, Yes.

\*\*\*

Q:	Knowing what you know now would you do anything different in this case?

\*\*\*

A:	Would I do anything different? I, in reviewing the documentation, I would have cross-examined the victim differently. I probably would have been more aggressive. And I hope that I would have won.

Q:	Did you treat Mr. Barber's case different than any other in which you have defended individuals in the last 17 years?

A:	No. Mr. Barber's case was a serious case and actually I liked Mr. Barber very much as an individual. So no, I did not treat it differently than I would treat any other serious case.

On redirect-examination by post-conviction counsel, trial counsel testified:

Q:     [Counsel], when you saw normal exam which doesn't rule out possible abuse.

A:     Yes.

Q:     You said that you didn't think you needed an expert –

A:     That's correct.

Q:     – to look at that.

A:     That's correct.

Q:     And you were satisfied with that opinion?

A:     Yes.

## IV.

## DISCUSSION

As mentioned, appellant contends that his trial counsel was constitutionally ineffective for not investigating and/or countering Dr. Wehberg's opinion that G.S.'s "normal" genital examination was not inconsistent with sexual abuse. Appellant maintains that expert testimony countering Dr. Wehberg's opinion would have both helped present a valid defense to the rape charge, and also aid in counsel's attack of G.S.'s credibility concerning whether any abuse occurred at all.

### A. **Standard of Review and Generally Applicable Legal Principles Regarding Ineffective Assistance of Counsel Claims**

Both the Sixth Amendment, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, and Article 21 of the Maryland Declaration of Rights guarantee the right to effective assistance of trial counsel. Under *Strickland v.*

*Washington*, 466 U.S. 668 (1984), ineffective assistance of counsel requires a two-prong analysis. *See Harris v. State*, 303 Md. 685 (1985). To establish ineffective assistance of counsel, it is the petitioner's burden to demonstrate (1) that, under the "performance prong," counsel's performance was deficient, i.e., counsel committed serious attorney error, and (2) that, under the "prejudice prong," counsel's deficient performance prejudiced the defense. *Oken v. State*, 343 Md. 256, 283 (1996); *Williams v. State*, 326 Md. 367, 373 (1992).

To meet the requirements under the "performance prong" and demonstrate "serious attorney error," a petitioner must show that the acts or omissions of counsel were the result of unreasonable professional judgment and that counsel's performance fell below an objective standard of reasonableness considering prevailing professional norms. *Cirincione v. State*, 119 Md. App. 471, 484 (1998). The "performance component" requires a "show[ing] that counsel's performance was deficient [, and] . . . counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

Under the "performance prong," if counsel's acts constituted reasonable "trial strategy" or "trial tactic," counsel's performance cannot be deemed "ineffective." *Oken*, 343 Md. at 283; *Schmitt v. State*, 140 Md. App. 1 (2001). Thus, we have said:

> In assessing the performance prong of an ineffective assistance of counsel claim under the Sixth Amendment, a court will indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. <u>The court must be highly deferential in reviewing counsel's performance, in order to avoid second-guessing counsel's assistance</u>. Until proven otherwise, the court presumes that counsel's representation was professionally competent, and that it derived not from error but from trial strategy. In *Strickland*, the Court explained:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*State v. Peterson*, 158 Md. App. 558, 583-84 (2004) (citation and quotation omitted) (emphasis added).

Under the "prejudice prong," a petitioner must show a "substantial or significant possibility" that, but for the serious attorney error, the result would have been different. *Bowers v. State*, 320 Md. 416, 426 (1990). A petitioner, however, "'need not show that counsel's deficient conduct more likely than not altered the outcome in the case.'" *Id.* at 425 (quoting *Strickland*, 466 U.S. at 693). Because the "prejudice prong" requires only a significant "possibility" of a different result, the prejudice analysis "should not focus solely on an outcome determination, but should consider 'whether the result of the proceeding was fundamentally unfair or unreliable.'" *Oken*, 343 Md. at 284 (quoting, in part, *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)). "'The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Coleman v. State*, 434 Md. 320, 331 (2013) (quoting *Strickland*, 466 U.S. at 686).

When reviewing a post-conviction court's ruling on appeal, we have said:

24

The standard of review of the lower court's determinations regarding issues of effective assistance of counsel is a mixed question of law and fact. We will not disturb the factual findings of the post-conviction court unless they are clearly erroneous. But, a reviewing court must make an independent analysis to determine the ultimate mixed question of law and fact, namely, was there a violation of a constitutional right as claimed. In other words, the appellate court must exercise its own independent judgment as to the reasonableness of counsel's conduct and the prejudice, if any. Within the *Strickland* framework, we will evaluate anew the findings of the lower court as to the reasonableness of counsel's conduct and the prejudice suffered. As a question of whether a constitutional right has been violated, we make our own independent analysis by reviewing the law and applying it to the facts of the case. We will defer to the post-conviction court's findings of historical fact, absent clear error, but we will make our own, independent analysis of the appellant's claim.

*State v. Jones*, 138 Md. App. 178, 209 (2001) *aff'd*, 379 Md. 704 (2004) (internal citations and quotations omitted, alterations from original).

In this case, the post-conviction court made no findings of "historic fact" that are here material. The court, however, made various conclusions of law regarding trial counsel's performance using the test set forth in *Strickland*. Those conclusions of law, insofar as here pertinent, will be reviewed *de novo*.

## B. <u>Analysis of the Performance Prong</u>

The State asserts that trial counsel's decision to not consult with an expert was part of a legitimate trial strategy or tactic and that appellant failed to prove that the strategic decision was uninformed or unreasonable. The State points out, accurately, that trial counsel testified that he:

1) was familiar with literature reporting on the sexual abuse of young girls and had participated in other trials where experts had testified on the subject; 2) had reviewed Dr. Wehberg's report; 3) was aware of the results of her

25

exam on G.S.; 4) had been a practicing attorney for fifteen[6] years with considerable experience representing defendants charged with all kinds of crimes; 5) had represented numerous defendants who had been charged with the sexual abuse of a child; 6) was, at one time, for a period of approximately four years, "the only one in the Public Defender's Office in Wicomico County litigating or handling these types of sex abuse cases"; 7) was satisfied with Dr. Wehberg's conclusion that, based on her exam, G.S. may or may not have been abused; and 8) knowing Dr. Wehberg's opinion, chose to defend [appellant] against the charges by impeaching G.S. and arguing that, given Dr. Wehberg's opinion and G.S.'s lack of credibility, the State had failed to prove [appellant's] guilt beyond a reasonable doubt.

According to appellant, his trial counsel did not meet the performance prong when he failed to consult with an expert because, had trial counsel done so, "he would have found a basis for challenging Dr. Wehberg's testimony about the consistency between her medical findings and G.S.'s allegations." According to appellant, an expert, such as Dr. Hariton, could have disputed (1) that the hymen of a little girl is very vascular and elastic, and (2) Dr. Wehberg's claim that medical literature existed supporting her statement that penile vaginal penetration in a prepubertal girl can occur without any physical findings.

Appellant further asserts that any strategy that did not involve investigating and/or countering Dr. Wehberg's conclusions was unreasonable. He argues:

> The one viable and in eliminable strategy in Mr. Barber's case was to discredit G.S., and challenging Dr. Wehberg's medical opinion that a normal finding could be consistent with G.S.'s allegations could in no way have detracted from that strategy. The decision to forego any investigation along these lines was pointless.

> In support of the aforegoing argument, appellant, *inter alia*, quotes from *Pavel v.*

---

[6] At the time of appellant's trial, his counsel had been practicing for 15 years; at the time of the post-conviction hearing he had been practicing for a longer period.

*Hollins*, 261 F.3d 210, 224 (2nd Cir. 2001) as follows:

> When a sex abuse case boils down to such a "credibility contest," physical evidence will often be important. Indeed, "many" sex abuse cases are "close . . . on the evidence," *Swofford v. Dobucki*, 137 F.3d 442, 443 (7th Cir. 1998), and when a case hinges all-but-entirely on whom to believe, an expert's interpretation of relevant physical evidence (or the lack of it) is the sort of "neutral, disinterested" testimony that may well tip the scales and sway the fact-finder. *Williams*, 59 F.3d at 682 ("In a credibility contest, the testimony of neutral, disinterested witnesses is exceedingly important."). **Because of the importance of physical evidence in "credibility contest" sex abuse cases, in such cases physical evidence should be a focal point of defense counsel's pre-trial investigation and analysis of the matter. And because of the "vagaries of abuse indicia," such pre-trial investigation and analysis will generally require some consultation with an expert**.

*Id*. at 224 (footnote omitted).

Appellant argues that the deficiency in his trial counsel's performance is confirmed by *Pavel*. In our view, the general rule espoused by *Pavel* is not necessarily applicable in all cases involving sex abuse of children. Its applicability, *vel non*, depends on: (1) what the prosecutor's expert is prepared to say; and (2) what trial counsel already knows about the subject of child abuse.

The trial strategy and tactics addressed in *Pavel* are quite different from those at issue in this case. Kenneth Pavel was accused of having anally sodomized his two sons, Matthew, age 7, and David, age 5. *Id.* at 214. According to the testimony of David and Matthew, their father anally sodomized them, at least once a week, for four months before they were examined by a physician and their father sodomized them even more frequently in the days leading up to an examination by a doctor. *Id.* at 224. In fact, David testified that he was sodomized at least three times in the twelve (12) day period before a doctor

examined him. *Id.* at 214.

At Mr. Pavel's trial, the State of New York did not call the physician who examined the two boys immediately after they reported that their father had anally sodomized them. Instead, the State called Dr. Celeste Madden, who, after reviewing the records of the physical exam of Matthew, testified that no relevant physical abnormalities were found by the examining doctor, while the records of David indicated only that he had a "mild perianal [erythema]," which Dr. Madden described as a "discoloration of the skin, redness around the anal area." She further testified that it was "possible" that diarrhea could cause such redness. Furthermore, she testified that David's "discoloration" was "consistent" with his account of sexual abuse, and that Matthew may have been anally sodomized as he described it without any physical indication of the sodomy remaining after the fact. *Id.* at 214-15.

At a post-conviction hearing, counsel for Pavel introduced an affidavit from Dr. Margaret McHugh, a physician with extensive experience in, among other things, evaluating and/or treating victims of child abuse. *Id.* at 228. In her affidavit, Dr. McHugh stated that the boys' medical condition was simply not "consistent" – as Dr. Madden had testified – with them having been repeatedly anally sodomized with the frequency that they described. Her affidavit read, in material part, as follows:

> I have reviewed the Grand Jury and trial testimony of Matthew and David Pavel….
>
> ***
>
> It is my opinion, to a reasonable degree of medical certainty, that the

28

clinical findings regarding Matthew and David are inconsistent with their testimony. Repetitive sexual attacks of the nature described by the boys, by an adult male without the use of a lubricant and/or sedation would be expected to result in clinical evidence such as tearing injuries and abrasions to each child's anus and rectum which would [have been] apparent on gross examination.

I have also reviewed the testimony of Dr. Celeste Madden. Dr. Madden testified that the absence of any abnormal findings in Matthew's physical examination is not inconsistent with the crimes of sodomy and sexual abuse. Given the boys' testimony, however, it is highly improbable that such repeated attacks within five (5) days of the exam would leave no physical evidence.

… [As to David, on whom a "mild perianal erythema" was noticed,] "[c]learly, the numerous acts of sodomy described by David would be expected to result in more than a mild erythema, *i.e.* a slight red discoloration.

*Id.* at 228 (emphasis omitted.)

Prior to Mr. Pavel's trial, his counsel was confident that at the close of the State's case the presiding judge would grant his motion to dismiss all charges. *Id.* at 216. Based on that optimistic forecast, Pavel's counsel decided "not to prepare a defense." *Id.* When the trial judge denied Pavel's motion to dismiss, counsel called no witnesses except for the defendant. *Id*. at 217. If Pavel's counsel had elected to do so he could have called two lay witnesses, both of whom could have presented important testimony that would have been favorable to the defense. The *Pavel* court observed that counsel's failure to call any witnesses other than the defendant was "strategic" in the sense that it related to a question of trial strategy, but that the decision was not taken, as it should have been, to serve the defendant's interest by providing the defendant with reasonably effective representation, rather it was taken to avoid work. *Id*. at 218.

In regard to the failure of trial counsel to call a medical expert, the *Pavel* court first noted that counsel's decision had "nothing to do with serving Pavel's interest." *Id*. at 223. Second, counsel's decision not to call a medical expert was deficient "because it was not based on pre-trial consultation with such an expert." *Id*. The *Pavel* court gave two reasons why counsel should have consulted an expert. The first was that there was no indication in the record that trial counsel "had the education or experience necessary to assess relevant physical evidence, and to make for himself a reasonable, informed determination as to whether an expert should be consulted or called to the stand." *Id*. at 224. That situation is not here present.

In regard to the second reason, the court said:

[T]here is an obvious, common-sense mismatch-which Meltzer [trial counsel] himself recognized before trial-between (1) Matthew and David's medical indications (nothing abnormal about Matthew, and mild "redness" in David's anal area) and (2) the allegations against Pavel (that he anally sodomized the boys once a week for four months, and that he did so with even greater frequency in the days leadings up to the examination of the boys). But in the face of this glaring mismatch a reasonably professional attorney would not have sat on his hands, confident that his client would be acquitted. He would have consulted and been prepared to call an expert to drive this disparity home. *See generally Holladay v. Haley*, 209 F.3d 1243, 1251-52 (11th Cir. 2000) (holding that an attorney's investigation is not "reasonable" within the meaning of *Strickland* when the facts of a case supply him with "notice" that a particular line of pre-trial investigation may substantially benefit his client, and he does not pursue it).

*Id.* at 224-25 (footnote omitted).

In *Pavel*, the court found three flaws in defense counsel's performance which were: (1) failure to prepare a defense; (2) failure to call important fact witnesses; and (3) failure to call a medical expert. *Id*. at 216-24. The court said:

30

> Because we conclude, that the *cumulative* weight of these flaws deprived Pavel of his Sixth Amendment rights, *see post* at 225, *see, e.g. Lindstadt*, 239 F.3d at 199 (holding that for Sixth Amendment purposes attorney errors must be considered "in the aggregate"), we do not consider whether *some* of these flaws-standing alone, or in combination with one another-could adequately support our conclusion that Meltzer's representation of Pavel was constitutionally deficient.

*Id.* at 216.

In regard to the third reason the *Pavel* Court gave in finding deficient performance, failure to consult with or call an expert, the most important distinction between this case and *Pavel* is that here there was no equivalent "common-sense mismatch" between the physical evidence and the story of the victim inasmuch as, in the case at bar, more than two years elapsed between the last act of (alleged) rape and the examination by the State's expert. Moreover, as will be shown, Dr. Wehberg's testimony that a "normal genital exam can be consistent with penetrating sexual abuse" was, in fact, backed up by pertinent peer reviewed medical literature. A competent trial lawyer, practicing in Maryland, would know that to prove second-degree rape the State did not have to prove that the child's hymen was ruptured and even Dr. Hariton seemed to agree that if the hymen was not ruptured there would be no evidence of rape when a physical exam is conducted two years after the rape.

We turn now to the second case relied upon by appellant in support of his position that his trial counsel was deficient in failing to consult or call an expert: *Holsomback v. White*, 133 F.3d 1382 (11th Cir. 1998). The facts in *Holsomback* were very similar to those in *Pavel*. Mr. Holsomback was convicted of first-degree sodomy of his son, Jeffrey.

31

Jeffrey testified that between 1982, when he was four years old, until November 1987, his father regularly subjected him to anal intercourse during their bi-weekly weekend visitation. *Id*. at 1384. Jeffrey was examined by a Dr. Williams for signs of sexual abuse. The examination occurred approximately twelve (12) days after the last incident of alleged sodomy. Dr. Nolan, Jeffrey's family physician, was not called as a witness, nor was he interviewed by defense counsel. In fact, the only witnesses who testified at the trial were the defendant and his son even though Mr. Holsomback's trial counsel had been urged by his client to call Dr. Nolan as a witness. *Id*. at 1385. Moreover, although Holsomback's trial counsel knew that Jeffrey had been examined for signs of sexual abuse prior to trial by Dr. Williams, trial counsel made no effort to interview Dr. Williams or obtain Dr. Williams's medical records. *Id*.

The *Holsomback* court held that defense counsel did not meet the performance prong of the *Strickland* test by failing to contact Dr. Nolan or Dr. Williams prior to trial. In the words of the *Holsomback* court, "[b]ecause counsel never actually spoke with the physicians, he remained entirely unaware – apart from his speculation that, at best, Dr. Williams would merely corroborate the lack of medical evidence – of whether and to what extent their testimony might have helped Holsomback's case." *Id*. at 1388.

Dr. Nolan, an expert in family medicine, testified at the post-conviction hearing that the defendant and Jeffrey had been patients of his since Jeffrey was approximately two years old. *Id*. Although he examined Jeffrey two to three times per year, he never saw any signs of sexual abuse nor did "Jeffrey exhibit the behavior patterns of a child who had been

32

sodomized[.]" *Id*. Dr. Nolan further testified that, based on his review of both the medical report prepared by Dr. Williams and a review of the transcript of Jeffrey's trial testimony, he believed that Jeffrey's "account of the sexual abuse was medically impossible." *Id*. In Dr. Nolan's view, "certain physical evidence of trauma to the anal area would be apparent to a doctor performing a rectal examination on a child who had been sodomized once within the previous ten days to two weeks or four times within the previous year." *Id*. Dr. Nolan further testified that although Dr. Williams had examined Jeffrey approximately twelve (12) days after the last incident of alleged sodomy, the medical report from Dr. Williams showed "no evidence of trauma or penetration of the anus." *Id*. at 1389. From this, Dr. Nolan concluded that Jeffrey had not been subjected to anal intercourse twelve (12) days prior to the rectal examination. *Id*.

In the subject case, it was undisputed that prior to trial appellant's counsel did examine Dr. Wehberg's report and there was no other treating doctor whose report trial counsel could have reviewed prior to trial. Dr. Wehberg's trial testimony was in accordance with her report; unlike the situation in *Holsomback,* the record does not show that anything would have been gained by interviewing the examining doctor (Dr. Wehberg) prior to trial.

As part of appellant's argument, in regard to the performance prong, he contends that if appellant had consulted an expert (like Dr. Hariton) or the relevant literature, counsel would have found that a prepubertal girl, who is the victim of "penetrating sexual abuse" could not have a normal genital exam.

33

Contrary to Dr. Hariton's testimony, there was ample medical literature from very reputable peer reviewed medical journals that supported Dr. Wehberg's opinion "that you can have penile vaginal penetration in a prepubertal girl without any physical findings." *See* Zitelli and Davis', *Atlas of Pediatric Physical Diagnosis* (6th ed. 2012), at 234 (stating that in "(up to 96%) [of exams] either there are no physical findings specific for sexual abuse or the examination is completely normal" and explaining that the "reasons for the absence of physical findings exist even when there is a confession of vaginal penetration by the perpetrator" and include "the fact that penetration may only extend to the labia; the hymen being recessed from and internal to the labia; the delay in disclosure so common in young victims; the rapid healing of injuries involving the mucosa; the elasticity of hymenal tissue; the fact that hymenal tissue is capable of regrowth and that, with the onset of puberty and increased estrogen production, the hymen regrows and becomes more elastic"); Kristine Fortin, MD, MPH & Carole Jenny, MD, MBA, Pediatrics in Review (An Official Journal of the American Academy of Pediatrics), *Sexual Abuse*, Vol. 33, Issue 1 (2012), page 23 stating that a normal physical exam "does not exclude the possibility of sexual abuse or prior penetration" and explaining that "[m]ultiple research studies demonstrate a low prevalence of definitive physical findings among victims of sexual abuse" (citing findings in a "case control study of close to 400 prepubertal children," and stating that "[p]hysical findings specific to previous genital trauma were found in only 2.5% of abused children") (footnotes omitted). In the medical literature just quoted, the authors cite from numerous studies and journal articles that reached a similar conclusion that were published

before appellant's 2010 trial.

Typical of conclusions arrived at in articles written in peer review journals prior to 2010, are those arrived at by Joyce A. Adams, Katherine Harper, Sandra Knudson, & Juliette Revilla, *Examination Findings in Legally Confirmed Child Sexual Abuse*: *It's Normal to be Normal*, Pediatrics, 1994; 94: 310-17) (hereinafter "Adams"). Those authors concluded:

> This study provides additional data that the majority of children with legally confirmed sexual abuse will have normal or nonspecific genital findings. Abnormal anal findings are very rarely found. The best predictors of abnormal genital findings in female victims are the time since the assault and a history that blood was reported or observed at the time of the molest. <u>A history of vaginal penetration given by the child did not significantly correlate with abnormal genital findings</u>.
>
> ***
>
> This study also reaffirms that the history of the molest provided by the child is probably the most important evidence of sexual abuse. <u>While widely accepted in the medical field, this fact is still not universally accepted in the legal arena</u>. There are many reasons why a child's examination may be normal, as reviewed by Bays and Chadwick, and these reasons need to be reiterated to professionals involved in the assessment of children who have been molested, as well as those who are responsible for decisions regarding legal proceedings.
>
> ***

*Id*. at 316 (emphasis added) (footnote omitted).

Dr. Hariton wrote an article in 2012 titled: "Sexual assault in prepubertal girls: 'It is normal to be normal' – or is it? Evidence of vaginal penetration in prepubertal girls," Med. Sci. Law, 52: 193-97 (2012) (hereafter "Hariton, Sexual Assault"). In that article, he concludes:

35

The result of the study both from review of the medical literature and an understanding of the anatomy and histology of the unestrogenized genitalia of the prepubertal girl makes it clear that if there has been forceful penile penetration of the hymen, there will be both a history of pain and bleeding and healed evidence of this forceful penetration.

*Id*. at 197.

As can be seen, Dr. Hariton's conclusion in the article he wrote is different from that set forth in the articles we have quoted. In his article Dr. Hariton acknowledges that these are pediatric journal articles that reach a conclusion contrary to his. In fact, from reading his article, it is evident that one of Dr. Hariton's primary purposes of writing the article was to criticize those articles that disagreed with him. For instance, he cites what he characterizes as the "two most quoted articles" that espouse the view "that there can be penetration without injury in prepubertal girls." *Id*. at 195. The articles that he criticizes are: David L. Kerns & Mary L. Ritter: "Medical findings in Child Sexual Abuse Cases With Perpetrator Confessing," American Journal of Disease of Children (1992), Vol. 146, p. 494, and David Muram, "Child sexual abuse: Relationship between sexual acts and genital findings," Child Abuse & Neglect (1989), Vol. 13, Issue 2 pages 211-16. In Dr. Hariton's 2012 article, besides criticizing articles that essentially mirror Dr. Wehberg's view, he also cites articles in professional journals, written prior to 2010, that agree with his opinion that if the hymen is ruptured, the rupture will always be evident in any post-rape exam.

A competent criminal defense lawyer representing a defendant in a case like this one, should, upon receipt of a report by a medical expert like Dr. Wehberg, consult an

independent expert <u>under</u> <u>some</u>, <u>but</u> <u>not</u> <u>all</u>, <u>circumstances</u>.  One of the circumstances where an expert should be consulted would be if the lawyer is unfamiliar with the medical literature concerning the issue about which the State's expert is prepared to testify.  In this case, trial counsel testified that he was presently familiar with the relevant medical literature.  But trial counsel was never asked about what he did know.  Except for trial counsel's testimony, there was no other direct or circumstantial evidence on this subject.  Because appellant failed to show that at the time of his 2010 trial his counsel was unfamiliar with the pertinent literature, the State was entitled to the benefit of the presumption that trial counsel's performance (insofar as it covered medical research) was professional and competent.  *State v. Peterson*, 158 Md. App. 558 (2004).

We turn now to the closely related question of what trial counsel should have known in 2010, if he consulted the relevant literature.  Appellant contends that trial counsel violated the performance standard because, if he had consulted the literature, he would have known that Dr. Wehberg was in error when she said that "the hymen of a little girl is very vascular and elastic."  There is nothing in the record to show that what Dr. Wehberg said about the vaginal area was in error.  So no matter how much research appellant's trial counsel had done, the State's expert could not have been effectively cross-examined on that point.  Appellant takes a contrary view, which is based on Dr. Hariton's testimony.  Dr. Hariton said that Dr. Wehberg was wrong when she said that "the hymen of a little girl is very vascular and elastic."  But, contrary to what Dr. Hariton testified to, Dr. Wehberg never testified that the hymen is "very vascular" and "elastic."  She testified that the

"vaginal area is very vascular and very elastic and can heal very rapidly." As the State points out, appellant's argument is like comparing apples to oranges.[7]

Appellant's next criticism of the performance of his trial counsel is based on the assertion that "[t]here is no getting around the fact that G.S. alleged that [a]ppellant forcefully penetrated her vagina with his penis." Appellant goes on to argue that forceful penetration of the vagina "necessarily entails penetration of the hymen." Under such circumstances, according to appellant, trial counsel should have consulted with and called to the witness stand a witness who would have testified as Dr. Hariton did at the post-conviction hearing.

In our view, G.S.'s testimony did not make it clear that there was "forceful penetration" through the hymen. *See* Adams, *supra*, at 321. ("Young children have no concept of what is meant by the term in the vagina. A statement such as 'he put his thing in my privates may or may not mean that full penetration occurred.'"). If there had been forceful penetration into the vagina, as both Dr. Hariton and Dr. Wehberg agree, there would have been bleeding – and G.S. did not report bleeding. As already pointed out, to prove second-degree rape in Maryland, proof of penetration through the hymen is not necessary. And, even Dr. Hariton does not contend that two years after the event that there would be signs of trauma, if the hymen is not ruptured. Under such circumstances, it is far

---

[7] Dr. Hariton's testimony that the hymen of a prepubertal girl is not elastic may not always be true. Dr. Hariton said in his testimony that an article by Felicity Goodyear-Smith and Tannis M. Laidlaw, entitled "*What is an Intact Hymen? A Critique of the Literature*," Med. Sci. Law (1998) Vol. 38, No. 4 at 290 was authoritative. In that article, the author's state: "The hymen may be thick or thin; elastic or non-elastic." *Id*.

from clear what would have been gained if appellant's counsel had found a doctor who would have contradicted Dr. Wehberg and said that if there is penetration of the hymen, there will be evidence of that penetration in a post-rape examination.

As mentioned earlier, Dr. Hariton also testified that Dr. Wehberg was mistaken when she testified "that there's medical literature saying that she's right, that you can have pen[ile] vaginal penetration in a prepubertal girl without any physical findings." But in this regard, it is Dr. Hariton who is wrong and not Dr. Wehberg. The error on Dr. Hariton's part in this regard is shown by the article he wrote, i.e., Hariton, Sexual Assault. In that article he attempts to discredit the articles and studies written prior to 2010 that reached the same conclusion as did Dr. Wehberg, i.e., that in a prepubertal girl you can have vaginal penetration without any physical findings.

In considering the contention that trial counsel's failure to consult with or call an expert to counter the State's expert's testimony, we are cognizant of the principle that it is presumed "that the acts or omissions of counsel [were] the product of reasonable professional judgment." *Cirincione*, 119 Md. App. at 486. The *Cirincione* Court said:

> Where a decision of counsel is based upon a merely partial investigation, the resulting tactical decision remains presumptively reasonable "precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. In other words, counsel's assistance is not ineffective if he either makes reasonable investigations or makes "a reasonable decision that makes particular investigations unnecessary." *Id*. Even a decision not to investigate is entitled to "a heavy measure of deference to counsel's judgment."

*Id*.

As earlier mentioned, trial counsel testified that, in his analysis, there are three

39

factors that can make for a successful defense in a child abuse case: (1) a reason for the victim to fabricate; (2) lack of physical evidence to support the victim's allegations; and (3) an articulate criminal defendant who can testify. According to trial counsel's unrebutted testimony, appellant's case contained all those factors. In other words, trial counsel articulated a thoughtful basis for arriving at his trial strategy. He decided to focus on G.S.'s lack of candor during her interviews with the police, in her statements to Dr. Wehberg, and in her disclosures to Heather Sullivan, the social worker.

It would not, of course, be considered sound trial strategy to not consult with a physician if something said in Dr. Wehberg's report was manifestly in error or that she held an opinion that a reasonably competent lawyer, familiar with the relevant literature, should have recognized as invalid. As shown, it is far from clear that any opinion Dr. Wehberg gave was in error. At the time of trial (and presently) some, but not all, experts in her field agreed with Dr. Wehberg that a normal physical exam does not exclude the possibility of past penile penetration of the hymen. Because of a significant number of journal articles supporting Dr. Wehberg's views, calling an OBGYN who shared Dr. Hariton's opinions would be risky inasmuch as such opinion could be contradicted, or at least undermined by the literature discussed, *supra.*

Because trial counsel's decision not to call an expert (like Dr. Hariton) is entitled to "a heavy measure of deference to counsel's judgment," *Cirincione*, 119 Md. App. at 486 (citation and quotation marks omitted), and because there is nothing in the record before this Court to demonstrate that trial counsel lacked the knowledge, training or skill to make

40

that decision, appellant has failed to carry his heavy burden to establish that his trial counsel's conduct did not fall "within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689.

Because we hold that appellant has failed to prove that the performance of his trial counsel was deficient, it is unnecessary for us to consider the prejudice prong of the *Strickland* standard.

**JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

**Exhibit A**



Mons pubis

Anterior commissure

Labia minora

Labia majora

Hymenal opening

Hymen

Border of
vaginal vestibule
(Hart's Line)

Fossa novicularis

Posterior fourchette
(orcommissure)

Perineum
(Perineal body)

Figure 12-4 Diagram of the genital anatomy of a prepubertal girl. This drawing shows a crescent hymen. (From Pokorny SF. Pediatric and Adolescent Gynecology. New York: Chapman and Hall, 1996.)